IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KIMBERLY ANN STEWART, | CV 16-160-BLG-TJC |
| Plaintiff, | **ORDER** |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

Plaintiff Kimberly Ann Stewart ("Plaintiff") has filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f. (Doc. 2.) The Commissioner has filed an Answer (Doc. 10) and the Administrative Record ("A.R."). (Doc. 11).

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for an award of

disability benefits, or alternatively for further administrative proceedings. (Doc. 13.) The motion is fully briefed and ripe for the Court's review. (Docs. 17, 18.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds the case should be **REMANDED** for further administrative proceedings.

## I.     PROCEDURAL BACKGROUND

On July 25, 2013, Plaintiff filed an application for DIB and SSI benefits. (A.R. 202-218.) Plaintiff alleged she has been unable to work since June 1, 2010. (A.R. 202; 209.) The Social Security Administration denied Plaintiff's application initially on November 12, 2013, and upon reconsideration on May 9, 2014. (A.R. 98-119; 120-147.) On June 2, 2014, Plaintiff filed a written request for a hearing. (A.R. 162-63.) Administrative Law Judge Michele M. Kelley (the "ALJ") held a hearing on April 14, 2015. (A.R. 41-97.) On May 18, 2015, the ALJ issued a written decision finding Plaintiff not disabled. (A.R. 11-29.) Plaintiff requested review of the decision on June 11, 2015. (A.R. 7.) The ALJ's decision became final on September 21, 2016, when the Appeals Council denied Plaintiff's request for review. (A.R. 1-6.) Thereafter, Plaintiff filed the instant action.

Plaintiff argues the ALJ committed reversible error by (1) improperly discrediting her testimony; (2) failing to properly evaluate the medical opinion evidence; (3) failing to include depression as a severe impairment; and (4) failing to incorporate all of Plaintiff's impairments into the vocational expert's hypothetical questioning.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

/ / /

## B.     Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin*., 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett*, 180 F.3d at 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

/ / /

/ / /

## III. FACTUAL BACKGROUND

Plaintiff alleged disability due to right knee replacement, migraines, depression, back pain, melanoma skin cancer, fibromyalgia, hip pain, neck pain, and insomnia.  (A.R. 230.)  She asserts that these impairments render her incapable of performing the work she previously performed, or any other substantial gainful employment.

### A. The Hearing

A hearing was held before the ALJ in Billings, Montana on April 14, 2015, and the following testimony was provided.

#### 1. Plaintiff's Testimony

Plaintiff testified that she lives in Molt, Montana on 163 acres of land with her husband.  (A.R. 52.)  She said the property is not a working ranch, and they do not even grow hay.  (A.R. 53.)  Plaintiff does have two horses, but she stated she has not been able to ride them since 2012.  (*Id.*)  Sometimes she will walk out in the field to see her horses, but she does not do anything else with them.  (*Id.*)  Her husband feeds them.  (*Id.*)

Plaintiff testified that she previously cared for her elderly in-laws, which included physically lifting them.  (A.R. 54.)  Plaintiff stated that in 2011, she

7

injured her back while she was trying to help lift her father-in-law after he had fallen.  (A.R. 55.)  She stated he was a big man, and she felt something in her back snap, and she had immediate pain down her right leg.  (*Id.*)  After her back injury, she reported gradually losing her mobility and strength.  (A.R. 55-56.)  Eventually she stopped physically assisting her in-laws.  (A.R. 56.)  Plaintiff stated that over time, she also stopped cooking and cleaning.  (A.R. 57.)

With regard to her physical limitations, Plaintiff stated she has difficulties cooking because it requires walking, twisting and bending.  (A.R. 58-59.)  Plaintiff also stated she cannot stand for any length of time.  (A.R. 59.)  Plaintiff indicated she has to change positions between standing and sitting every 20 minutes, she cannot walk very far, and she needs to lay down two to three times a day for 20 to 30 minutes.  (A.R. 59-60.)  Plaintiff testified that she sleeps in a recliner chair because it is too painful to sleep flat, and she does not sleep well because of her pain.  (A.R. 60-61, 69.)  She stated she is unable to lift a gallon of milk due to pain. (A.R. 61-62.)  She cannot bend, and her husband has to pick things up off the ground for her.  (A.R. 64.)  Plaintiff reported she cannot vacuum, and that it had been approximately one year since she did dishes.  (A.R. 64-65.)

Plaintiff testified that she has had over 30 knee surgeries due to a birth defect, with the most recent surgery being a total right knee replacement. (A.R. 63.) She indicated she also needed the left knee to be replaced, but was putting it off. (*Id.*) She also stated that she fractured her neck 30 years ago, and has neuropathy in her right arm as a result. (A.R. 64.) She said she experiences difficulties with fine motor skills and writing because she has no feeling in her middle finger. (A.R. 65-66.) She indicated she's had the problem with her finger "forever." (A.R. 66.) Plaintiff stated she could type for 30-40 minutes, but then would have to stop for the day. (*Id.*) She also said she gets tremors from her medications two to three times per week. (A.R. 67.)

Plaintiff described herself as formerly being an extremely active person. (A.R. 68.) She loved sports, cut wood, and helped her kids on the ranch. (*Id.*) She stated her days currently consist of waking and getting up (which takes about a half an hour and requires her husband's help), getting a cup of coffee and sitting in her recliner. (A.R. 68-69.) On bad days, Plaintiff cannot get out of her chair, but on good days she can walk around her front porch and get fresh air. (A.R. 77.) She estimates she has five or six bad days a week. (A.R. 78.) Plaintiff said she no longer drives because of her sciatica and numbness in her right leg. (A.R. 69.)

With regard to mental limitations, Plaintiff testified that she has difficulty being around other people due to anger issues. (A.R. 70-71.) She explained that when her husband became addicted to drugs, she developed homicidal and suicidal ideations, which resulted in being hospitalized. (A.R. 70-71.) She also described experiencing road rage while driving, which requires her to pull over because she wants to hit and kill people. (A.R. 71.) She stated she does not visit with friends because she is not a very pleasant person to be around when she is in pain, and she gets very mean. (A.R. 72.) Plaintiff stated she cannot concentrate, but is able to focus to read and watch television. (A.R. 72-73.) She tried to go back to college to finish a nursing degree, but eventually dropped out. (A.R. 74.) She said she had a hard time concentrating in class and could not get comfortable. (*Id.*) She stated she also had difficulty concentrating enough to complete on-line coursework. (*Id.*)

Plaintiff admitted she smokes medical marijuana in the evenings to help her sleep. (A.R. 75.) She feels marijuana works better than narcotics, and she does not like the side effects of narcotics. (*Id.*) Plaintiff stated her orthopedic surgeon, Dr. McDowell previously told her she needed back surgery, but he would not perform the surgery because she was uninsured. (A.R. 76.) Plaintiff explained she recently obtained health insurance with the help of her parents. (*Id.*) Therefore,

Dr. McDowell had scheduled her for surgery later in the week. (*Id.*) He was reportedly going to perform two laminectomies and two discectomies. (*Id.*)

Plaintiff testified that she felt the biggest issue keeping her from working or being functional was her back. (A.R. 77.)

### 2. Vocational Expert's Testimony

Delane Hall, a Vocational Expert, also testified before the ALJ. (A.R. 87-96.) The ALJ asked Mr. Hall three hypothetical questions. First, the ALJ asked Mr. Hall to assume a person the same age as Plaintiff, and with the same work history and educational background, who could lift 10 pounds frequently, and 20 pounds occasionally, walk and stand sit 6 hours in and 8-hour workday, sit 6 hours in an 8-hour workday, frequently climb ramps, stairs and balance, occasionally climb ladders/ropes/scaffolds, occasionally stoop, kneel, crouch, and crawl, and avoid concentrated exposure to extreme cold, noise vibration and work hazards. (A.R. 87-88.) Mr. Hall testified such a person could perform Plaintiff's past work as an office manager, real estate agent, reservation agent, and transcription supervisor. (A.R. 88.) Mr. Hall stated Plaintiff could also perform unskilled jobs, such as office helper, blood donor assistant, and survey working interviewer. (A.R. 89.)

Second, the ALJ asked Mr. Hall to assume the same person, but with the limitation that the person can understand, remember and carry out only unskilled tasks up to a vocational preparation of 2, can make only simple work decisions, tolerate only occasional changes in a routine work setting, and can have only occasional interaction with supervisors, coworkers, and the public, and should not work directly with the public. (A.R. 90.) Mr. Hall stated that the individual would be able to perform the jobs of office helper, mail clerk, and parking lot attendant. (A.R. 91.) Third, the ALJ asked Mr. Hall to assume the same person, but with the limitation the person would be off task 20% of an 8-hour workday. (A.R. 91.) Mr. Hall stated no jobs would be available. (A.R. 90-91.)

Plaintiff's counsel asked Mr. Hall if there would be any jobs if the person was unable to be on their feet for more than 2 hours and could not lift more than 10 pounds. (A.R. 92.) Mr. Hall stated the person could still perform the job of office helper. (A.R. 93.) Next, Plaintiff's counsel asked if it would be an issue for a person to miss work twice a month. (A.R. 94.) Mr. Hall indicated it would. (*Id.*) Finally, counsel asked Mr. Hall about the effect if the person had limitations on handling/fingering or needed to change positions. (A.R. 94-95.) Mr. Hall testified those limitations would eliminate all but the parking lot attendant job. (*Id.*)

**B.     Medical Evidence**

The administrative record includes Plaintiff's medical records from several health care providers.  The Court has summarized only those records that are relevant to the specific issues presented for review.

1.     Treating Physician Evidence

a.     *Andrew M. Schmidt, M.D.*

Plaintiff saw Dr. Andrew Schmidt at Billings Clinic in June 2009 for pain in her right knee.  (A.R. 373-74.)  After trying cortisone injections without relief, Dr. Schmidt performed a total knee replacement surgery in July 2009.  (A.R. 362-72.) Approximately one year later, Plaintiff reported still experiencing mild knee pain, but x-rays showed the knee components were in the appropriate placement, and Dr. Schmidt determined Plaintiff's condition was best managed with observation. (A.R. 342-46.)

In February 2011, Plaintiff returned to see Dr. Schmidt.  (A.R. 326-27.)  She indicated she was having some pain in her right knee, and pain in her right buttock and down her right leg.  (A.R. 326.)  Dr. Schmidt noted Plaintiff had a mildly positive straight leg test.  (*Id.*)  X-rays of her knee showed no significant change from May of 2010, and x-rays of her pelvis were normal.  (*Id.*)  X-rays of her L-

spine showed degenerative disk narrowing at L2-3 and L5-S1, with mild osteoarthritis at the L5-S1 facet joints. (*Id.*)

An MRI was conducted on March 4, 2011, which showed marked narrowing at L2-3, greater on the right, and degenerative narrowing of the interspine at L5-S1. (A.R. 321-22.) Dr. Schmidt recommended an epidural steroid injection. (A.R. 318.)

On April 29, 2011, Plaintiff received the epidural steroid injection. (A.R. 311.) At that time, Dr. Schmidt noted that Plaintiff was tender to palpitation throughout the lumbar spine and SI joints bilaterally. (A.R. 312.) She was able to do heel and toe stands, and could forward flex and back extend without overly exacerbating her symptoms. (*Id.*) He also noted Plaintiff reported she worked as a rancher, and often rode horses. (*Id.*) It does not appear Plaintiff followed up with Dr. Schmidt following the injection.

b.  *William Oley, M.D.*

On April 21, 2011, Plaintiff saw Dr. William Oley at the Beartooth Billings Clinic. (A.R. 385.) Plaintiff reported having significant back pain. (*Id.*) She stated she was riding her horse chasing a rank cow, and it exacerbated her symptoms. (*Id.*) Plaintiff indicated she was scheduled for an epidural steroid

injection, but was hesitant about it.  (*Id.*)  She wanted to try oral steroids first.  (*Id.*)
Dr. Oley prescribed a Medrol Dosepak, and instructed her to follow-up for the
epidural steroid injection if her symptoms persisted.  (*Id.*)

On July 7, 2011, Plaintiff presented to Dr. William Oley's office in distress.
(A.R. 383.)  Dr. Oley described Plaintiff as severely upset and having suicidal
ideation.  (*Id.*)  Plaintiff reported having a severe amount of stress related to
problems with her husband and family.  (*Id.*)  Dr. Oley spoke to the psychiatric
acute care team at Billings Clinic, and Plaintiff's parents agreed to drive her to the
emergency department in Billings.  (*Id.*)

After Plaintiff was released from Billings Clinic, she followed up with the
Beartooth Billings Clinic on July 14, 2011, and was seen by Physician Assistant,
Douglas Whitehead, PA-C.  (A.R. 380-81.)  Plaintiff indicated she had been
experiencing severe stress because her husband was abusing prescription
medications and they had separated.  (*Id.*)  Plaintiff reported that she cried easily
and had a difficult time controlling her anger. (*Id.*)  She was interested in a mood
stabilizer.  (*Id.*)  Mr. Whitehead prescribed carbamazepine.  (A.R. 381.)

On July 19, 2011, Plaintiff saw Dr. Oley again.  (A.R. 378.)  At that time,
she stated she was doing better, had no suicide ideation and denied any true

homicidal ideation, but was terribly upset and mad at her husband. (*Id.*) Dr. Oley directed Plaintiff to continue with counseling and her medications. (*Id.*)

Plaintiff did not return to Dr. Oley's office until May 23, 2012. (A.R. 432.) At that time, Plaintiff thought she might have fibromyalgia. (*Id.*) She indicated she had diffuse muscle and joint pain, but was trying to maintain an active exercise program. (*Id.*) Dr. Oley noted her gait and station were normal. (*Id.*) He prescribed gabapentin, and ordered some blood work. (*Id.*)

On October 15, 2012, Plaintiff saw Dr. Oley for complaints relating to her depression and hip pain. (A.R. 434-35.) Plaintiff reported her depression was worse, which she attributed to stress. (A.R. 434.) Dr. Oley increased her Effexor, and encouraged her to get back into counseling. (A.R. 453.) With regard to her hip, she stated her right hip started hurting after she fell off a horse a few months prior. (A.R. 434.) It hurt when she went up and down stairs or elevations. (*Id.*) Dr. Oley's examination showed extreme point tenderness over the right trochanteric bursa, consistent with trochanteric bursitis. (A.R. 435.) He administered a steroid injection. (*Id.*) Plaintiff also reported a dog bite on her right middle finger. (*Id.*) Dr. Oley stated her tendons and nerve functions appeared normal, and he prescribed an antibiotic. (*Id.*)

Plaintiff followed up with Dr. Oley regarding her hip pain three months later, on January 9, 2013. (A.R. 437-38.) Plaintiff reported that the last steroid injection helped her significantly, and she requested another injection. (A.R. 437.) Dr. Oley administered another injection. (*Id.*) Plaintiff also reported having significant lumbosacral pain. (*Id.*) Dr. Oley noted Plaintiff's back showed mild discomfort to touch, and flexion and extension was limited secondary to pain. (*Id.*)

On March 20, 2013, Plaintiff returned to Dr. Oley's office with complaints of significant diffuse joint pain, mostly in her greater trochanteric region, but also her hands, shoulders, and knees. (A.R. 439-40.) Dr. Oley administered another steroid injection to her hip and ordered blood work. (A.R. 440.)

On April 22, 2013, Dr. Oley noted Plaintiff's vitamin D was low and her cholesterol was elevated. (A.R. 441-42.) He noted Plaintiff had maximized her exercise, and that she had symptoms consistent with vitamin D deficiency. (A.R. 441.) Dr. Oley prescribed vitamin D and a cholesterol lowering medication. (*Id.*)

      c.    *Gregory S. McDowell, M.D.*

On November 10, 2011, Plaintiff saw an orthopedic surgeon, Dr. McDowell, at Ortho Montana in Billings, MT. (A.R. 511-14.) Plaintiff reported that she had been having back pain since trying to lift her father-in-law after he fell to the

ground.  (A.R. 511.)  She indicated she had weakness and numbness and tingling in her right leg.  (*Id.*)  She said her pain is improved with unloading the spine, and aggravated with standing, walking, lifting, coughing, bending rotating the hip, and extending the leg.  (*Id.*)  It was noted that Plaintiff was an everyday smoker.  (A.R. 512.)  Plaintiff's x-rays and MRI were reviewed, and she was diagnosed with degenerative disc disease and early hip osteoarthritis.  (A.R. 513.)  Dr. McDowell indicated he wanted to start with conservative treatment, and recommended an intra-articular hip injection.  (A.R. 514.)  The injection was administered on November 17, 2011.  (A.R. 407; 515.)

On January 24, 2012, Plaintiff returned to Ortho Montana and saw Dr. Zach Scheer, M.D.  (A.R. 517-19.)  Plaintiff indicated the injection she received in November 2011 helped somewhat, but not completely.  (A.R. 517.)  An examination showed Plaintiff had normal range of motion in the knees and ankles, reduced range of motion in the hips, limited range of motion in the lumbar spine, no tenderness over the greater trochanter, and negative Stinchfeid and straight leg tests.  (A.R. 518.)  It was recommended that Plaintiff have a diagnostic injection of the right sacroiliac joint combined with a pain diary.  (*Id.*)  Plaintiff was unsure if

she wanted to follow the recommendation, and she was instructed to call if she wanted to proceed. (*Id.*)

About three years later, on February 9, 2015, Plaintiff returned to see Dr. McDowell. (A.R. 520-22.) Plaintiff stated she continued to have back and hip pain. (A.R. 520.) Plaintiff reported that she used to ride horses and be active on a gentlemen's ranch, but her pain had risen to a 10, her walking tolerance was down to one minute, and she had nighttime pain and loss of sleep. (*Id.*) Dr. McDowell stated she was exquisitely tender in the region of the L5 spinous process, and had non-anatomic pain findings. (A.R. 521.) He also noted she was tearful and appeared depressed. (*Id.*) X-rays showed no major arthritis in the hip, but suggested mild degeneration in the right hip acetabulum laterally. (*Id.*) Dr. McDowell also noted age appropriate degenerative changes on the lateral lumbar study at L5-S1. (*Id.*) Dr. McDowell's impression was that Plaintiff's disability was "above and beyond what would be expected with these conditions." (*Id.*) He recommended further workup and treatment, but noted that Plaintiff was a self-pay patient. (A.R. 522.) He encouraged her to consider open enrollment in a health plan. (*Id.*) He thought she also needed to see someone for psychological counseling. (*Id.*)

On April 2, 2015, Plaintiff followed up with Dr. McDowell, after she had obtained health insurance. (A.R. 524-25.) Dr. McDowell noted Plaintiff reportedly quit smoking, and she felt her depression was being treated effectively. (A.R. 524.) Dr. McDowell ordered an updated MRI. (A.R. 525.) The MRI showed degenerative disc disease, with marked disc space narrowing at L2-3, and lateral recess stenosis on the right at L5-S1. (A.R. 526-28.) Dr. McDowell recommended decompressing the right L5-S1 region. (A.R. 528.)

On April 17, 2015, Dr. McDowell performed a right L5 partial hemilaminectomy and decompression of the nerve root. (A.R. 529.)

d. *Janice Fordham, M.D.*

Plaintiff established care with Dr. Janice Fordham at St. Vincent Healthcare on May 22, 2014. (A.R. 499-510.) Plaintiff reported having chronic back pain, and stated she had to change her daily activities and can no longer ride horses. (A.R. 500.) Dr. Fordham noted that Plaintiff had a medical marijuana card. (*Id.*) On examination, Plaintiff was positive for back and joint pain. (A.R. 501.) Dr. Fordham noted Plaintiff was negative for depression and presented with a normal mood and affect. (*Id.*)

/ / /

e.    *Kimberly M. Molloy, M.D.*

On August 29, 2011, Plaintiff had a hysterectomy performed by Dr. Daniel

Molloy, M.D.  (A.R. 415-16.)  Dr. Molloy noted that at that time, Plaintiff smoked

two packs of cigarettes a day.  (A.R. 415.)

2.    Other Source Evidence

a.    *Jeffrey Cummins, LCSW*

On July 7, 2011, Plaintiff presented to the Billings Clinic Emergency

Department due to suicidal ideation.  (A.R. 302-09.)  Plaintiff was found to be a

risk to herself and admission was recommended.  (A.R. 303.)  Plaintiff was seen by

licensed clinical social worker Jeffrey Cummins for a psychiatric acute care

evaluation.  (A.R. 305-09.)  Plaintiff reported feeling overwhelmed with life, that

she was dealing with her husband's substance abuse and was in the midst of a

possible divorce, and reported many family members, as well as herself, were

dealing with medical problems.  (A.R. 305.)  Plaintiff admitted she thought of

shooting herself with her gun.  (A.R. 306.)  However, she stated that her initial

suicide ideation was impulsive, and that she did not want to be hospitalized.  (*Id.*)

/ / /

/ / /

b.    *Debra Perrigo, BS, LAC*

In May 2013, Plaintiff was referred to Lighthouse Addiction Counseling Service for anger management counseling after being charged with partner/family member assault.  (A.R. 444-47.)  Plaintiff saw licensed addiction counselor Debra Perrigo.  (*Id.*)  Ms. Perrigo stated Plaintiff reportedly struggled with depression most of her life.  (A.R. 446.)  Plaintiff admitted she has severe mood swings and can become violent at times.  (*Id.*)  Ms. Perrigo noted the anger management sessions seemed to give Plaintiff some insight into how her communication patterns and reactions have created problems in her life.  (A.R. 444.)

On August 26, 2013, Ms. Perrigo wrote a letter indicating Plaintiff completed 40 hours of anger management counseling.  (A.R. 443.)  It was noted that Plaintiff seemed to make progress in this area of her treatment.  (*Id.*)

c.    *Gloria Weiss, LCPC*

Plaintiff saw Gloria Weiss, a licensed clinical professional counselor from July 18, 2011 through December 7, 2011.  (A.R. 474-86.)  Plaintiff sought counseling for anger, resentment, hurt and depression.  (A.R. 474.)  Ms. Weiss noted that Plaintiff had a history of depression, suicidal ideation with a plan, and homicidal ideation towards her husband.  (*Id.*)  Ms. Weiss's treatment notes

indicate significant relationship problems between Plaintiff and her husband. (A.R. 476-85.)  On October 3, 2011, Ms. Weiss noted Plaintiff had increased physical pain which was causing more depression.  (A.R. 481.)  Plaintiff also reported increased suicidal ideation with her increased pain.  (A.R. 482.)

        3.     <u>Examining Physician Evidence</u>

        a.     *Dale Peterson, M.D.*

On October 9, 2013, Plaintiff was examined by Dr. Dale Peterson, M.D., at the request of the Disability Determination Service of the Montana Department of Public Health and Human Services.  (A.R. 465-67.)  Plaintiff indicated she had pain over the posterior aspect of her right hip and into her buttock.  (*Id.*)  She stated an injection she received a year or two prior only improved her pain by about 25%. (*Id.*)  Dr. Peterson noted Plaintiff got up and stretched throughout the interview and seemed to have pain in her lower back.  (A.R. 467.)  Upon examination, Dr. Peterson noted Plaintiff walked normally, but could not walk on the toes or heels of her right foot because it bothered her back.  (*Id.*)  Plaintiff could flex her lumbar spine about 15 degrees, but would not extend it.  (*Id.*)  When she was seated, she could extend her right leg 75 degrees, and had some pain in her right buttock.  (*Id.*) She had less pain when her left leg was extended 90 degrees.  (*Id.*)  He indicated

there was no clear cut weakness in the lower extremities. (*Id.*) Dr. Peterson noted Plaintiff had no atrophy in the upper extremities and no weakness of the small muscles of the hands. (*Id.*) Finally, Dr. Peterson noted that he thought Plaintiff had significant depression. (*Id.*)

Plaintiff was re-examined by Dr. Peterson on April 29, 2014. (A.R. 469-72.) Plaintiff reported that her back pain had increased since she last saw Dr. Peterson. (A.R. 469.) She described the pain as being sharp, burning and located at the L3-4 level bilaterally. (A.R. 470.) Plaintiff reported that she had been given a low dose of prednisone for her liver and it helped her back. (*Id.*) When she was not able to get another prescription, so she obtained veterinary prednisone from a friend, and had been taking that twice a day for 5 months. (*Id.*)

Dr. Peterson stated Plaintiff exhibited a lot of pain behavior during the interview and she limped. (A.R. 471.) She alternated between sitting, standing, walking, and bending over the table. (*Id.*) Plaintiff indicated it hurt her low back to reach her hands over her head. (*Id.*) She had a very slight tremor on finger-to-nose testing, and some soreness around her right elbow. (*Id.*) While standing, Plaintiff would not flex her lower back more than 2 degrees and would not extend it at all. (*Id.*) Plaintiff could walk, and her balance appeared normal, but heel or

toe walking caused pain in her right leg.  (*Id.*)  While sitting, the slightest degree of straight leg raises caused sudden spasms in her low back.  (*Id.*)  While lying on her back, Dr. Peterson noted he was able to bring her hips to almost 90 degrees and her hip rotations were full.  (*Id.*)  He noted there was also tenderness over her right tronchanteric bursa.  (*Id.*)  Dr. Peterson indicated that when Plaintiff left the department, she walked much more comfortably than she did in the office.  (A.R. 471-72.)

          b.     *Tristan Sophia, Psy.D.*

On October 2, 2013, Plaintiff was evaluated by Tristan Sophia, Psy.D, for a consultive psychological evaluation.  (A.R. 460-63.)  Dr. Sophia noted that Plaintiff had been diagnosed with Major Depressive Disorder, and her symptoms include suicidal and homicidal ideation, fatigue, sadness, crying and anger.  (A.R. 460-61.)  Dr. Sophia also indicated Plaintiff had completed court-ordered anger management classes following an arrest for partner/family member assault.  (*Id.*)  Plaintiff was currently prescribed Effexor to help stabilize her mood.  (A.R. 461.)  Plaintiff indicated she had some problems with insomnia and had a decreased appetite.  (*Id.*)  Plaintiff reported the last time she had homicidal ideation was

toward her husband one week before, but she did not follow through with her plan to shoot him because she didn't want to go to jail. (*Id.*)

Dr. Sophia described Plaintiff's attitude as polite and cooperative, and found her attention and concentration were adequate. (A.R. 461.) Dr. Sophia said Plaintiff can mostly complete daily living skills independently, but needs some help dressing due to back pain. (A.R. 462.) Plaintiff reported her daily activities include watching television, playing Solitaire, doing laundry, folding clothes, spending time with her horses, and playing with her dogs. (*Id.*) Plaintiff further reported she is no longer able to ride or train her horses or vacuum. (*Id.*) Dr. Sophia found Plaintiff's social functioning appears impaired because she does not initiate social contact, avoids her friends, and avoids going out due to being aggravated by people. (*Id.*) Nevertheless, Dr. Sophia noted that Plaintiff can interact appropriately, communicate clearly, and that she exhibited cooperative behavior during the assessment. (*Id.*) She also stated Plaintiff does not seem to manage daily stress well. (A.R. 463.)

Dr. Sophia opined that Plaintiff's ability to engage in work related activity may be inhibited by her physical limitations. (*Id.*) She found Plaintiff's depression was exacerbated by her decreased physical abilities and lack of

employment. (*Id.*) Dr. Sophia stated that if Plaintiff could find a fulfilling job that she could do with her physical limitations, her mood would likely improve. (*Id.*) However, Dr. Sophia opined that Plaintiff's current depression would affect her ability to work reliably. (*Id.*) She stated Plaintiff would need on-going psychological and psychiatric treatment to become a reliable employee. (*Id.*)

4.      Non-Examining Physician Evidence

a.      *William Fernandez, M.D. and Tim Scholfield, M.D.*

Dr. William Fernandez reviewed Plaintiff's medical records, but did not examine her, and did not testify at the hearing. He issued an opinion on November 11, 2013. (A.R. 1806-07.) Dr. Fernandez opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently. (A.R. 106.) Dr. Fernandez found Plaintiff can stand or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour work day. (*Id.*) He stated Plaintiff should be allowed to alternate sitting and standing to relieve pain, which can be accomplished through normal breaks. (*Id.*) Dr. Fernandez also stated Plaintiff should be limited to occasionally climbing ladders/ramps/scaffolds, stooping, kneeling, crouching and crawling. (A.R. 106-07.) He found Plaintiff should also avoid concentrated exposure to noise and vibration due to migraines. (A.R. 107.)

Upon reconsideration of the initial denial of Plaintiff's claim, non-examining physician, Dr. Tim Schofield, M.D. agreed with Dr. Fernandez's limitations. (A.R. 129.)

    b. *Marsha McFarland, Ph.D. and Dean Gregg, Ph.D.*

Dr. Marsha McFarland also reviewed Plaintiff's medical records, but had no contact with her, and did not testify at the hearing. Dr. McFarland issued an opinion on November 8, 2013. (A.R. 104-05.) Dr. McFarland stated Plaintiff's mental symptoms do not restrict her activities of daily living, that she has mild difficulties in maintaining social functioning, and that her concentration, persistence and pace is intact. (A.R. 104-05.) Dr. McFarland noted that situational factors affect her mood. (A.R. 105.) Dr. McFarland opined that the degree of limitation reported by Plaintiff "is not consistent with her lack of treatment or the objective findings." (*Id.*)

Upon reconsideration, Dr. Dean Gregg agreed with Dr. McFarland's assessment, and opined that Plaintiff's mental factors were not severe or prolonged enough to prevent activities of daily living or work activity. (A.R. 128-29.)

/ / /

/ / /

## C.     The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2010.  (A.R. 13.)  Second, the ALJ found that Plaintiff has the following severe impairments: "degenerative disc disease, osteoarthritis of the right sacroiliac joint and hip, and trochanteric bursitis."  (*Id.*)  The ALJ also noted that Plaintiff had been diagnosed with hypertension, hyperlipidemia, headaches, gastroesophageal reflux disease, osteoarthritis of the knees and cataracts.  (*Id.*)  But the ALJ did not find these impairments were severe.  (*Id.*)  The ALJ further noted that the record did not contain a diagnosis of fibromyalgia.  (*Id.*)  With regard to depression, the ALJ found it did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities.  (*Id.*)

Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments.  (A.R. 15.)  Fourth, the ALJ stated Plaintiff has the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the ability to lift, carry, push and pull up to 10 pounds frequently

and up to 20 pounds occasionally; stand and/or walk for 6 hours in an
8 hour day; sit for 6 hours in an 8 hour day; frequently climb ramps or
stairs and balance; and occasionally climb ladders, ropes or scaffolds,
stoop, kneel, crouch or crawl. She must avoid concentrated exposure
to extreme cold, noise and workplace hazards such as wet, slippery or
uneven surfaces, dangerous machinery and unprotected heights.

(A.R. 16.)

The ALJ next found that Plaintiff is able to perform her past work as a real

estate agent. (A.R. 26.) The ALJ alternatively found Plaintiff could perform the

requirements of representative occupations such as officer helper, blood donor unit

assistant, and survey worker. (A.R. 28.) Thus, the ALJ found that Plaintiff was

not disabled. (*Id.*)

## IV. DISCUSSION

Plaintiff argues that the ALJ erred by improperly discrediting her testimony,

failing to properly evaluate the medical opinion evidence, erroneously ignoring

depression as a severe impairment, and failing to incorporate all of Plaintiff's

impairments into the vocational expert's hypothetical questioning.

### A. The ALJ's Credibility Determination

Plaintiff argues that the ALJ's credibility determination was erroneous

because the ALJ made only a general credibility finding without providing clear

and convincing reasons for rejecting her testimony. The Commissioner counters that the ALJ properly evaluated Plaintiff's credibility.

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so. *Id.* "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)). *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social

Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004). However, the ALJ may not reject the claimant's statements about the intensity and persistence of their pain or other symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2).

Here, the first step of the credibility analysis is not at issue. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of her symptoms. The Court finds the ALJ failed to do so.

The ALJ stated Plaintiff's testimony regarding the degree of her pain and functional limitations was not entirely credible because it was inconsistent with her activities of daily living. (A.R. 24.) The ALJ said Plaintiff described taking care of her in-laws and traveling to Santa Fe as recently as 2013. (*Id.*) The ALJ also emphasized that Plaintiff reported she was doing more than her husband with regard to activities such as mowing and cleaning the house. (*Id.*) The ALJ's observations are not supported by the record. Treatment notes referencing these activities were from 2011. (*See e.g.* A.R. 335 (treatment note from January 3, 2011 stating Plaintiff travelled to Santa Fe); 477 (treatment note from August 8, 2011, stating Plaintiff felt she did more daily activities than her husband); 478 (treatment note from August 15, 2011 indicating Plaintiff cared for her father-in-law).) Consequently, the ALJ's statement is factually incorrect and, thus, does not support her finding that plaintiff lacks credibility. *See Regennitter v. Commissioner,* 166 F.3d 1294, 1297 (9th Cir.1999) (the ALJ's "inaccurate characterization of the evidence" supporting his adverse credibility finding warranted reversal).

The ALJ next noted that the medical evidence was limited, and not of the frequency or type that would be expected given Plaintiff's claim of significant

functional limitations. (A.R. 16, 24.) The ALJ stated Plaintiff's alleged financial barriers to obtaining medical treatment were not credible in light of the fact Plaintiff could afford to smoke marijuana and one to two packs of cigarettes a day. The Ninth Circuit has indicated the mere fact a claimant can afford cigarettes is not a persuasive reason to discount the claimant's explanation for lack of medical treatment. *See Hunt v. Colvin*, 642 Fed.Appx. 755, 757 (9th Cir. 2016) (stating the "cost of medical treatment is not likely equivalent to the cost of [the claimant's] daily cigarette consumption"). *See also McElhaney v. Astrue*, 2011 WL 1045760, *5-6 (W.D. Wash. 2011) (holding ALJ erred in citing claimant's cigarette smoking as reason to conclude the claimant could afford medical treatment, where the ALJ assumed with no foundation that the cost of a pack of cigarettes would cover the claimant's costs for medical treatments ). Here, the ALJ did not make any findings about the cost of Plaintiff's medical treatment, the cost for her to obtain health insurance, or the cost of her cigarette habit and marijuana use.[1] As such, the ALJ's credibility determination in this regard is not supported by substantial evidence of record.

---

[1] The Court notes that Plaintiff submitted documentation that her husband is a state approved medical marijuana provider, and grows her marijuana for her. Therefore, she does not purchase it. (A.R. 299.)

Finally, the ALJ stated the objective findings on examination had been relatively "mild and minor." (A.R. 24.) The Court finds the ALJ's determination in this regard is not supported in light of the objective medical tests that showed Plaintiff had "marked narrowing at L2-L3" (A.R. 321-22), "significant degeneration within the L2-3 disc space" (A.R. 513), "marked disc space narrowing" at L2-3 and "moderate right side neural foraminal narrowing" at L5-S1 (A.R. 526). Moreover, Plaintiff underwent spine surgery three days after the hearing, which would indicate Dr. McDowell considered her to have more than mild or minor findings. (A.R. 529-30.)

Accordingly, the Court finds the ALJ's credibility finding is not supported by specific, clear, and convincing reasons that are based on substantial evidence in the record.

## B.     The ALJ's Evaluation of the Medical Source Opinions

Plaintiff contends that the ALJ failed to give proper weight to the opinions of Dr. Gregory McDowell, Dr. Janice Fordham, Dr. Dale Peterson, Dr. Tristan Sophia, Dr. William Oley, Dr. Daniel Molloy, Debra Perrigo, Gloria Weiss, Douglas Whitehead, and Jeffery Cummings. In response, the Commissioner argues the ALJ properly considered the medical source evidence.

1.   <u>Legal Standard</u>

At the time Plaintiff's claim was filed, the Social Security regulations separated medical evidence into two categories: (1) "acceptable medical sources," which includes licensed physicians and licensed or certified psychologists; and (2) "other sources," which includes nurse practitioners, physician's assistants, therapists, and counselors.  20 C.F.R. 416.913(a), (d) (amended March 27, 2017). *Leon v. Berryhill*, 2017 WL 7051119, *3 (9th Cir. Nov. 7, 2017) (noting that prior to March 27, 2017, opinions of "other sources," such as nurse practitioners were not given the same weight as a physician's opinions).

Opinions of "acceptable medical sources," i.e. treating physicians, may only be rejected under certain circumstances.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons."  *Id.*  To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record."  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  The same standards apply to the ALJ's evaluation of an examining

physician's opinion.  *Lester*, 81 F.3d at 831 n.8; *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006).

Opinions of "other sources," are not entitled to the same deference.  *Molina v. Astrue*. 674 F.3d 1104, 1111 (9th Cir. 2012).  The ALJ may discount opinions from "other sources" if the ALJ gives "germane reasons" for doing so.  *Id.*

### 2.    Dr. Dale Peterson

Plaintiff saw Dr. Peterson twice for consultive physical examinations.  (A.R. 465-73.)  The ALJ discussed Dr. Peterson's evaluations, but failed to state what weight, if any, she assigned to them.  The Court finds this constitutes error.

The ALJ must consider and evaluate any opinion by an examining physician or state agency medical consultant.  20 C.F.R. § 404.1513a (b)(1).  Further, the ALJ "must explain the weight given to these opinions in their decisions."  SSR 96-6P, 1996 WL 374180, *1 (S.S.A. July 2, 1996).  *See e.g. Foley v. Colvin*, 2015 WL 5836173, *3-5 (N.D. Tex. Oct. 2, 2015) (holding the ALJ's failure to explain the weight that he assigned to the examining consultants' opinions required reversal and remand); *Archuleta v. Astrue*, 2013 WL 1283828, *4 (D. Colo. March 28, 2013) (holding remand was appropriate where ALJ did not articulate what weight was given to an examining psychologist).

The Court finds, therefore, that the ALJ erred with regard to Dr. Peterson's opinion.

### 3.    Gloria Weiss, LCPC

In her decision, the ALJ considered a Clinical Eligibility for Mental Health Services Form completed by Ms. Weiss on July 18, 2011.  (A.R. 26; 474-75.)  The ALJ stated she afforded Ms. Weiss's opinion "little weight" because it was inconsistent with the other evidence in the record.  (A.R. 26.)  However, the ALJ incorrectly characterized Ms. Weiss's opinion.  The ALJ stated Ms. Weiss "opined that the claimant was not able to live or work independently, and was at risk of homelessness due to her mental impairments."  (A.R. 26.)  In fact, Ms. Weiss indicated the exact opposite.  (*See* A.R. 475 (answering "no" to questions "is the individual unable to live independently due to mental illness?" and "is the individual homeless or at risk of homelessness due to mental illness?").)

In light of the mischaracterization, the Court finds the ALJ erred in considering Ms. Weiss's opinion.

/ / /

/ / /

/ / /

### 4. Dr. Gregory McDowell

Plaintiff argues the ALJ failed to give proper weight to the findings and opinions of Dr. McDowell. In her decision, however, the ALJ gave Dr. McDowell's opinion "significant weight." (A.R. 25.) Dr. McDowell was Plaintiff's treating physician. The opinion of a treating doctor is generally entitled to the greatest weight. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.) ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2).

Accordingly, the Court finds the ALJ did not err in considering Dr. McDowell's opinion.

### 5. Dr. Tristan Sophia

In her decision, the ALJ considered Dr. Sophia's consultive mental evaluation. (A.R. 25.) The ALJ afforded Dr. Sophia's opinion "some weight." (*Id.*) The ALJ found Dr. Sophia's opinion lacked specificity, did not quantify Plaintiff's limitations, and it was highly reliant on Plaintiff's subjective representations, which the ALJ determined were not entirely credible. (*Id.*)

In light of the Court's finding with respect to the ALJ's assessment of Plaintiff's credibility, the fact Dr. Sophia's opinion relied on Plaintiff's representations is not a legitimate reason to discount her opinion. Nevertheless, being mindful that the Court cannot substitute its judgment for that of the ALJ, the Court finds the ALJ gave other sufficiently specific and legitimate reasons for affording lesser weight to Dr. Sophia's opinion. *Molina*, 674 F.3d at 1111. As the AJL pointed out, Dr. Sophia's opinion that Plaintiff had impaired social functioning was inconsistent with her observations that Plaintiff exhibited cooperative behavior during the assessment, interacted well with the public, seemed to respond appropriately to authority figures, and reported a history of good teamwork with supervisors and co-workers. (A.R. 462.) In addition, Dr. Sophia did not quantify how Plaintiff's depression affected her ability to work. (A.R. 463.)

Accordingly, the Court finds the ALJ did not err in considering Dr. Sophia's opinion.

### 6.    Jeffrey Cummings, LCSW

The ALJ did not mention Jeffrey Cummings by name in the decision. However, the ALJ referenced "the GAF scores assessed by counselors at the

Billings Clinic," which refers to Mr. Cummings' treatment notes. (A.R. 26; 305-09.) The ALJ indicated she did not give significant weight to GAF score Mr. Cummings assessed. (A.R. 26.)

The Court finds the ALJ gave sufficient reasons for giving little weight to Mr. Cummings' assigned GAF score of 50.[2] The ALJ correctly noted that GAF scores are based on many considerations, and are not intended to assess disability. *See McFarland v. Astrue*, 288 Fed. Appx. 357, 359 (9th Cir. 2008) (citing 65 Fed. Reg. 50746, 50764-64 (Aug. 21, 2000)) ("The GAF score does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."); *Doney v. Astrue*, 485 Fed. Appx. 163, 165 (9th Cir. 2012) (holding it was not error for the ALJ to disregard the claimant's GAF score).

Accordingly, the ALJ did not err with regard to Mr. Cummings.

/ / /

/ / /

---

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. According to the DSM–IV, a GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Garrison v. Colvin*, 759 F.3d 995, 1003 (9th Cir. 2014) (internal citations omitted).

7.    Dr. Janice Fordham, Dr. William Oley, Dr. Daniel Malloy, Debra Perrigo, BS, LAC, and Douglas Whitehead, PA

The record contains treatment notes from Dr. Janice Fordham, Dr. William Oley, Dr. Daniel Molloy, Debra Perrigo and Douglas Whitehead. (A.R. 378-79; 380-82; 383-92; 415-419; 432-42; 443-47; 499-510.) But none of these medical providers offered medical opinions concerning Plaintiff's functional capacity. The ALJ's opinion indicates she considered the treatment notes, but the ALJ did not assign any weight to them. (A.R. 17-22.)

Treatment notes, in general, do not constitute medical opinions. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Because the providers did not offer opinions regarding Plaintiff's limitations or ability to work, their treatment notes do not constitute medical opinions the ALJ must weigh. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear

and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions.").

Accordingly, the ALJ did not err by failing assign a weight to the treatment notes of Dr. Janice Fordham, Dr. William Oley, Dr. Daniel Molloy, Debra Perrigo and Douglas Whitehead.

### C.    Consideration of Depression as an Impairment

Plaintiff next argues the ALJ failed to consider Plaintiff's depression a severe impairment. The Commissioner asserts the ALJ properly determined that Plaintiff's mental impairments were mild.

Under step two of the sequential evaluation process, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R 404.1520(c); 416.920. At the step two inquiry, "the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)). The Social Security Act defines a "severe" impairment as one "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment or combination of impairments may be found 'not

43

severe *only* if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290). The step two "inquiry is a de minimis screening device [used] to dispose of groundless claims," *Smolen*, 80 F.3d at 1290.

Here, the ALJ found Plaintiff's depression was not severe at step two. (A.R. 14.) The ALJ touched on the four broad functional areas for evaluating mental disorders, known as the "paragraph B" criteria. (*Id.*) The ALJ concluded that Plaintiff suffered from no more than mild limitations in each area. (*Id.*) The ALJ further observed that Plaintiff's depression is well controlled with medication, and that although Plaintiff had experienced some exacerbations of symptoms, they were situational and did not persist. (*Id.*) While the ALJ's analysis of the paragraph B criteria is not extensive, the ALJ's observations are consistent with the evidence in the record. (*See* A.R. 305-09; 378; 409; 434; 474-86; 501-02; 524.) Accordingly, the ALJ's finding of non-severity was supported by substantial evidence.

A finding of non-severity at step two does not, however, relieve the ALJ from further considering an impairment. At step four of the sequential evaluation

process, the AJL must determine the claimant's RFC.  20 C.F.R. §

404.1545(a)(5)(i).   The RFC represents the most the claimant can do in a work

setting despite the claimant's physical and mental limitations.  20 C.F.R. §

404.1545(a)(1).  In assessing the RFC, the ALJ must consider the "limitations and

restrictions imposed by all of an individual's impairments, even those that are not

'severe.'  While a 'not severe' impairment(s) standing alone may not significantly

limit an individual's ability to do basic work activities, it may – when considered

with limitations or restrictions due to other impairments – be critical to the

outcome of a claim."  SSR 96-8P, 1996 WL 374184, * 5 (S.S.A. July 2, 1996). *See

also* 20 C.F.R. § 404.1545(e).

As the ALJ noted, the RFC assessment "requires a more detailed

assessment" than the assessment of whether an impairment is severe at step two.

(A.R. 14.)  Rather than providing a detailed assessment, however, the ALJ stated

only that "the following [RFC] assessment reflects the degree of limitation the

undersigned has found in the 'paragraph B' mental function analysis."  (*Id.*)  The

ALJ did not explain how she determined Plaintiff's depression would not lead to

RFC limitations when considered together with Plaintiff's other severe

impairments.  When a claimant's impairments are supported by substantial

evidence in the record, the ALJ must either consider them in the RFC or cite reasons for excluding them. *See Robbins v. Social Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006). The ALJ may not simply ignore them. *Id.* (stating the ALJ "is not free to disregard properly supported limitations.").

Therefore, although the ALJ found Plaintiff's mental impairments were not severe, the ALJ was still required to consider whether any limiting effects of her depression in combination with her other severe impairments, affected her ability to work.

Accordingly, the Court finds the ALJ erred by failing to consider Plaintiff's mental impairments in the RFC or explaining why she excluded them. The Court further finds that the error was not harmless. It is possible Plaintiff's mental impairments, when considered together with her other limitations or restrictions, may be critical to the outcome of her claim. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).

**D.      The ALJ's Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.**

If a claimant shows she cannot return to previous work, the burden of proof shifts to the Secretary at step five to show that the claimant can do other kinds of work. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). The Secretary may

use a vocational expert to meet that burden. *Id.* Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Id.* "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747, 756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422.

As discussed above, the Court has determined the ALJ failed to adequately consider the opinions of Dr. Peterson and Ms. Weiss, the effect of Plaintiff's depression in combination with her other severe impairments, and adequately support her reasons for discounting Plaintiff's credibility. Accordingly, these errors may have infected the hypotheticals that the ALJ relied on, and in turn, the ALJ's determination at step five. Therefore, the Court finds the ALJ's determination at step five is not supported by substantial evidence.

## VI.    CONCLUSION

Based on the foregoing,  **IT IS ORDERED** that the Commissioner's decision denying DIB and SSI be **REVERSED**, and this matter **REMANDED**

pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**IT IS ORDERED**.

DATED this 30th day of March, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge